38 C.C.P.A. (Patents)

## DIAMOND v. WOODYARD et al.

Patent Appeal No. 5729.

United States Court of Customs
and Patent Appeals.

Jan. 16, 1951.

———◆———

F. W. Lyle, Ralph H. Swingle and Hymen Diamond, all of East Pittsburgh, Pa., and Gordon S. Parker, Washington, D. C., for appellant.

Thomas M. Ferrill, Jr., New York City, Paul B. Hunter and Herbert H. Thompson, Brooklyn, N. Y., for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON and WORLEY, Judges.

O'CONNELL, Judge.

This is an appeal from the decision of the Board of Interference Examiners of the United States Patent Office awarding to appellees priority of invention of the subject matter defined by counts 5 and 6, which read as follows:

"5. An electric discharge device comprising means for producing a stream of

electrical charges, a hollow-body resonator interposed in the path of said stream, a portion of said resonator being capable of change in position to vary the resonant frequency of said resonator, and thermal means connected to said portion for changing the position of said portion to vary the resonant frequency of said resonator.

"6. An electric discharge device comprising a hollow-body resonator, a cathode, and means for bunching electrons emitted from said cathode and causing the bunched electrons to give up energy in said resonator, in combination with mechanical means for altering the distributed capacity and inductance of said resonator and electrically heated thermal means for actuating said mechanical means."

The issue, as the interference was declared on May 27, 1946, consisted of counts 1-4. Appellant's priority as to those four counts was admitted by appellees, who moved to amend the interference by the addition of the two counts in issue.. That motion was granted and judgment with respect to the four original counts was entered by the Board of Interference Examiners in favor of appellant. From that judgment no appeal was taken.

There was no dispute that the counts are applicable to the disclosure of each of the parties, as described by the board: "The invention here in issue pertains to the thermal tuning of klystrons, which are electronic discharge devices of the ultra-high frequency type having a beam of electrons projected by an electron gun through an evacuated hollow body resonator. Tuning, in the prior art, was effected by manually moving certain mechanical parts of the resonator or a member into and out of the resonator. The alleged improvement here is directed to thermal means for effecting a movement of an element in the resonator to produce the equivalent effect of the previously manually moved mechanical means."

Appellant, Diamond, the senior party, filed his application July 11, 1940, and appellees, Woodyard and Varian, the junior party, filed their application December 6, 1943, as a continuation-in-part of a five-party application, No. 428,682, filed January 29, 194?. The applications were copending in the Patent Office and the board held that Woodyard and Varian, the junior party, had the burden of proving their case by a preponderance of the evidence.

The junior party, appellees, filed testimony, all of which was stipulated, and the senior party, appellant, relied on his earlier record date of filing, July 11, 1940, for conception and constructive reduction to practice. Both parties filed briefs and were represented at final hearing.

The case was submitted on the preliminary statements and evidence presented by the parties. On August 11, 1948, the board rendered its decision awarding priority to appellees. Appellant petitioned for a rehearing and also filed a supplemental petition for the alleged purpose of obtaining an amplification, correction, and reversal of the board's decision.

The petition for correction was denied October 25, 1948, the board holding that no error in its original decision had been found which would alter the outcome of the interference. The petition for amplification was granted to the extent of explaining the degree of proof required of appellees in the establishment of their case but denied as to any reversal of the board's original decision.

A review of the decision of the board and of the record on which the decision was based is required by the fifteen reasons of appeal filed by appellant.

In the first place, the record shows that the real parties in interest are the Westinghouse Electric Corporation, assignee of appellant Diamond, and the Sperry Gyroscope Company, Inc., assignee of appellees Woodyard and Varian. The record also discloses, as appellees point out in their brief, that: "An illustrative version of the claimed subject matter is a klystron tube having a 'buncher' resonator and a 'catcher' resonator with a system for projecting a stream of electrons through these resonators in succession, the thermal control system being employed in connection with the 'catcher' resonator."

Count 5 calls for thermal means to vary the resonant frequency of a klystron resonator; count 6 for mechanical means actuated by thermal means for altering the distributed capacity and inductance of the catcher resonator.

Woodyard and Varian alleged in their preliminary statements that during 1937, 1938, and 1939 they were engaged in the Physics Department of Stanford University in the development of microwave tubes of the klystron type; that during such period several klystron tubes of various types were there constructed and tested; that it was then noted the output frequency of such devices was temperature sensitive, so that frequency control means and temperature compensation might be necessary; that during the period in question it occurred to Woodyard and Varian that the effect hereinbefore described could be usefully applied to deliberately vary the tuning of such a tube; that this conception was then disclosed to their co-workers, and the invention hereinbefore described was reduced to actual practice in April of 1938.

The first tube of the klystron type, Model A, was successfully tested in August of 1937 and formed the basis for the Varian patent, No. 2,242,275, issued May 20, 1941, on an application filed October 11, 1937, appellees' Exhibit No. 1. A subsequent model incorporating various improvements was begun in early 1938 and it appears that the parts thereof were fabricated by February 25, 1938, and assembled as appellees' "Klystron Model C" in early March of 1938, as shown by a photograph taken on March 8, 1938, appellees' Exhibit No. 3.

The record discloses that appellees' Model C Klystron was particularly adapted for thermal tuning and was tested by appellees for its effectiveness during April and May of 1938. Those tests and the Model C Klystron are described as follows in the narrative of the stipulated testimony:

"As related above, in the Model C Klystron, the resonator gap length was made adjustable, and the resonator was accordingly tunable, by adjusting the spacing between two flanges connected respectively to the two grids defining the gap therebe-tween, this adjustment being made by means of adjustable struts connected between the flanges. This tube was therefore particularly adapted for thermal tuning.

"It was early demonstrated that change in tuning of the Model C klystron could be produced by changing the temperature of or applying heat to the struts. Such thermal tuning had exactly the same effect as manual tuning. This was done either by holding one or more struts in the hand to supply heat from the hand to the strut, or by holding a match underneath a strut to heat it. Such experiments showed that the klystron resonator could be detuned enough to drive the tube completely out of oscillation from a condition of optimum oscillation.

"On the Model C klystron tests were conducted by Sigurd Varian to show the effectiveness of such thermal tuning. Wathen carried some high-current storage batteries to the laboratory, which already had a carbon-pile rheostat there. One terminal of the battery was connected in series with the rheostat to the center of one "buncher" resonator strut on the Model C klystron tube, the other terminal of the battery being connected to the resonator body of the tube, which was at ground potential.

"First, with the rheostat adjusted to provide no current to the strut, the tube was energized from its voltage sources, and was adjusted to optimum oscillating condition. It was run at this condition for a sufficient time to attain stable operation, being readjusted from time to time until no further readjustment was required. The line indications on the spectrograph screen was then of maximum length.

"Then the rheostat was adjusted to permit current flow to the strut. Such current flow to the strut divided there, half flowing from the center of the strut toward each end. This current produced heating of the strut by virtue of the ohmic losses inherent in it, and it was demonstrated that, by varying the strut current, by adjusting the rheostat, controllable amounts of resonator frequency deviation or tuning were obtained. Thus, starting from the condition of optimum oscillation, the addition of a slight

amount of current to the strut decreased the amplitude of oscillation, as was indicated by a decrease in the length of the line indication on the spectrograph screen. Further increase in strut current completely detuned the resonator to which the strut was connected so that oscillations ceased entirely. However, upon retuning the resonator by the mechanical manual tuner connected to it, or by decreasing the strut current and permitting the strut to cool, the original oscillating condition was restored. It was shown that an increase in strut current produced a change of resonator frequency in one direction while a decrease in strut current produced a change in the opposite direction. It was also shown that variation in strut current produced exactly the same effects upon the device as manual mechanical variation of strut length.

"These tests were repeated using the catcher resonator strut as the thermally controlled strut, and the same results were obtained. With either resonator, the frequency of the controlled resonator was adjusted at will, by varying the rheostat setting, over the entire frequency range between maximum of tube oscillation and zero oscillation. By adjustment of the strut current, any desired degree of resonance was obtained.

"These tests were performed by Sigurd Varian in the presence of John R. Woodyard and Robert L. Wathen, and established to their satisfaction that a practical and effective way of controlling the frequency of a resonator electrically was by means of such thermal tuning apparatus."

More of the stipulated testimony relative to the date of the tests of the claimed device performed on the Model C klystron was held by the Board of Interference Examiners to prove that appellees, Woodyard and Varian, reduced their invention to practice some time in either April or May of 1938; and that the precise date of their conception was not critical or necessary to be determined, since appellees reduced their arrangement to practice prior to the filing date of July 11, 1940, on which the senior party Diamond relied for conception and constructive reduction to practice. On that basis, priority of invention of the subject matter of counts 5 and 6 was awarded to appellees.

The two points which appellant raises here are thus stated in his brief: "In appealing from this award, Diamond contends (1) that the evidence which the Examiner of Interferences held to establish reduction to practice, even if all doubts are resolved in favor of Woodyard and Varian, establishes an experiment which was abandoned, and not actual reduction to practice of an invention, (2) that the Examiner of Interferences relied on insufficiently corroborated evidence in awarding priority to the junior party."

Appellant rested his case, as he had a perfect right to do, on what he considered an insufficient or inadequate state of facts set forth over the signature of his attorney in the stipulation hereinbefore described. Appellant also had a valid right to bring out any additional facts he may have had to offer in support of his position either by cross-examination of appellees and their corroborating witness or by the introduction of evidence on appellant's part. Appellant chose to exercise no such rights.

The court in appraising the evidence need not determine whether appellant's attorney signed the stipulation under the predominant belief, as indicated in the original decision of the board, that the testimony in question "merely shows the possibility of detuning the klystron rather than showing a tuning of the same." Nor is it proper to speculate here whether appellant's attorney might have deliberately signed the stipulation and refrained from taking testimony and cross-examining appellees' witnesses because, as appellees assert in their brief, appellant possibly realized that such measures "might not only fail to help his case but might bring out even more forcibly the strength and accuracy of the case for the junior party." Teter v. Kearby, 169 F.2d 808, 36 C.C.P.A.,Patents, 706.

In view of the conclusion that appellees actually reduced the invention defined by the counts to practice, their later inactivity and delay in filing the present

application is not material, since there is no adequate proof of actual abandonment, suppression, of concealment of the invention. Hainsworth v. Philipp, 129 F.2d 350, 29 C.C.P.A.,Patents, 1088.

■ Appellant argues in his brief that there was no proper corroboration of appellees' testimony: "The only evidence on thermal tuning is purely verbal. Under such circumstances, clear and specific corroboration of the inventors is imperative, and the burden is on the junior party to produce such corroborating evidence."

The bulk of the evidence within the stipulation is verbal, supported by photographs and documentary exhibits. The summary of all such testimony is contained in the following excerpt from the stipulation: "These tests were performed by Sigurd Varian in the presence of John R. Woodyard and Robert L. Wathen, and established to their satisfaction that a practical and effective way of controlling the frequency of a resonator electrically was by means of such thermal tuning apparatus."

Appellant contends here that the testimony of Robert L. Wathen must be rejected because he had not been properly established as a corroborative witness:

"Moreover, the witness Wathen appears not to have been competent at the time to carry out, as an independent person, the complex chain of reasoning which would be required of him as a corroborating witness. * * *

"Today, Wathen is Senior Project Engineer of the Inventions Research Department of Sperry and might be competent. But the events under consideration happened more than 10 years ago. And then Wathen was merely a 'Technical Assistant' in the Department of Physics at Stanford, 'especially active in obtaining materials and equipment' for the research and development carried on by the group working on the klystron * * * . The only specific thing which it is said that he did, is that he 'carried some high-current storage batteries to the laboratory' * * * a mere manual labor job. * * *"

The board in its original decision remarked with reference to appellees' stipulated testimony that "The sufficiency of the corroboration of this testimony has not been questioned" by appellant. On that point, appellant apparently raised the specific issue for the first time in his petition and supplemental petition for rehearing. The members of the board in response to that argument, and with appellant's and appellees' briefs before them, stated with respect to appellant's position there: "The entire argument in the supplemental petition beginning with the middle of page 1 and continuing to the middle of page 2 relates to the question of inventorship and the question of corroboration can only be spelled out of the subject matter in the original brief to which this argument relates by giving the terms a strained and unnatural or an unexpected interpretation. In other words, the subject matter to which this argument relates questions the effect or the weight to be given the stipulated testimony, not, whether or not it is sufficiently corroborated as set forth at the top of page 2 of the opposition. The statement by the Board of Interference Examiners under consideration is deemed to correctly sum up the position taken by Diamond in his original brief."

Appellees point to the stipulated testimony of Wathen as fully corroborating the inventors Woodyard and Varian and cite authority to the effect that in a case, such as the record here presents, the oral testimony of inventors coupled with that of one corroborating witness, as to events occurring ten years previously, may be relied on to constitute a reduction to practice. Dreyer, Jr. v. Haffcke, 137 F.2d 116, 119, 30 C.C.P.A.,Patents, 1278. What we said there continues to hold good here:

"If what counsel for appellant state in the quoted excerpts from their brief is true, it is strange that they did not bring out such facts either on cross-examination of appellee and his corroborating witness or by the introduction of evidence on the part of appellant, rather than to depend upon argumentative matter in their brief.

"We are unable to accept such statements in a brief, not supported by evidence of record."

Reverting to the record in the instant case, it is noted that counsel for appellant over his signature previously stipulated additional facts regarding Wathen's qualifications to which appellant has made no reference in his present brief: "Robert L. Wathen is at present Senior Project Engineer of the Inventions Research Department of the Sperry Gyroscope Company Division of the Sperry Corporation at Great Neck, New York. From 1937 to 1940, he was Technical Assistant in the Department of Physics of Stanford University, and in this capacity was closely associated with and assisted the klystron research group of the Physics Department. He was especially active in obtaining materials and equipment for the research and development carried on by this group, and was in daily contact with the group and their laboratories, and witnessed and assisted in the construction and testing of many types of tubes of the klystron type upon which the group was working. In 1940 he became employed by the Sperry Gyroscope Co., Inc., which employment has continued until the present time."

■ It is a matter of common knowledge that in 1937 and 1938 the klystron was a pioneering achievement in microwaves and that materials for research and development, special instruments for power measurements, and communication equipment were not readily available if they then existed in the art. Wathen's willingness under such circumstances to perform "a mere manual labor job." as appellant puts it, might well have been an attribute of character to which Wathen owes his present position.

The device actually tested by appellees was their electrical heating arrangement for one or more struts employed in a complete and operative Model C Klystron, as pointed out in appellees' brief: "These thermal tuning tests, which followed the tests reported by Dr. Webster in Exhibit 5, were carried out long before Diamond entered the field, in the presence of the co-inventors and Robert L. Wathen, an employee in the Physics Department at Stanford University, a man with a college background who, through his connection with the Physics Department and his friendship with Hansen and Woodyard and the Varian brothers, had been acquainted with the klystron development and progress throughout the above-mentioned period in 1937 and 1938 * * *."

■ In challenging the sufficiency of appellees' proofs, appellant urges that appellees, the junior party, were required to prove their case before the board beyond a reasonable doubt. The burden of proof on the junior party in an interference proceeding between pending applications requires that he establish priority by a fair preponderance of the evidence and not beyond all reasonable doubt. Field v. Knowles, 183 F.2d 593, 37 C.C.P.A.,Patents, 1211; Kenyon v. Platt et al., 152 F.2d 1006, 33 C.C.P.A.,Patents, 748.

Appellant in the instant case admits in his brief that "Whether or not the applicants of this application [appellees] or its assignee, Sperry Gyroscope Company, saw the Diamond application before they filed the five-party application is not clear from the printed Record." Appellant then argues at length in his brief that appellees or their assignee, before the junior party filed their application, had seen appellant's application and were thereby stirred to activity. Appellant has failed, however, to show any valid basis in the record for the contention that appellees were not the original inventors of the subject matter in issue.

Before the Board of Interference Examiners appellant unsuccessfully challenged the stipulation signed by his counsel regarding the tests relied on to establish appellees' reduction to practice. There appellant constantly contended not only that the wholly stipulated testimony was not sufficient to establish a reduction to practice of the tested device, but also that such testimony indicated no more than an abandoned experiment. The Board of Interference Examiners held, with no manifest error, that appellees clearly established a reduction to practice of the invention defined by the counts in issue and were entitled to the award of priority.

■ Basing his final position on the assumption, for the purpose of argument

only, that the wholly stipulated testimony was in fact sufficient to establish the thermal tests on which appellees relied for a reduction to practice, appellant further contends in his brief, and, for the first time, that: "Woodyard and Varian still cannot prevail because Model C was an incomplete device not capable of actual use, and because the tests on Model C were not made under conditions of normal service, as is necessary to constitute a reduction to practice."

The board proceeded on the basis that the klystron was fully operative and concluded that the electro-thermal apparatus in issue controlled the resonant frequency of the catcher resonator in the desired manner. It is noteworthy that appellant did not raise these objections in the tribunals of the Patent Office in the original instance or in his petition or supplemental petition for reversal of the board's decision. Appellant may not properly raise such objections here for the first time. In re Herthel, 174 F.2d 935, 36 C.C.P.A.,Patents, 1095. See also Anderson v. Walch, 152 F.2d 975, 33 C.C.P.A., Patents, 774; Downs v. Andrews, 58 App.D.C. 91, 97, 25 F.2d 218.

■ Subsequent to the filing of the record in this court, appellees filed a motion to correct diminution of the record, seeking to have included certain papers and documents described in the record. The motion was granted subject to an order of the court that the costs of printing the additional matter requested by appellees should be taxed on final decision. We find that the additional documents were proper parts of the record and that they should have been included in the original transcript. Under such facts, the costs of printing the additional matter will be taxed against appellant. See Thompson v. Hamilton, 152 F.2d 994, 33 C.C.P.A.,Patents, 732, 736.

In view of the conclusion hereinbefore expressed, it is deemed unnecessary to discuss additional points urged by appellant. The decision appealed from is accordingly affirmed.

Affirmed.